UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| TYLER SCHIRMER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 5:23-cv-00004-GFVT-EBA |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| POWELL COUNTY DETENTION | ) | **ORDER** |
| CENTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is before the Court on Plaintiff Tyler Schirmer's Partial Motion for Summary

Judgment [R. 82] and the Powell County Defendants' Motion for Summary Judgment [R. 88].

For the following reasons, Schirmer's Motion for Partial Summary Judgment is **DENIED** and

the defendants' Motion for Summary Judgment is **GRANTED**.

**I**

On May 15, 2022, in Powell County, Kentucky, Ryan Schirmer planned to visit his

sister's home to do some yard work. [R. 88-3 at 29–30]. Ryan lived with his brother, Plaintiff

Tyler Schirmer, at their mother's home. *Id.* at 7. Ryan needed some gasoline to mow his sister's

lawn but did not have a gas can. *Id.* at 30. Evaluating the situation, Ryan decided that he would

fill up a windshield wiper fluid container with gasoline. *Id.* Before doing that, he emptied the

windshield wiper fluid into a two-liter fruit juice jug.[1] *Id.* at 32. After pouring the wiper fluid

into the juice jug, Ryan put it on the floorboard of his mother's car, which he used to travel both

---

[1] In his deposition, Ryan variously described the bottle as a "Kool-Aid jug," a "Hawaiian Punch jug," and even suggested that "it could have been Sunny D. It could have been anything, really." [R. 88-3 at 30–31].

to his sister's house and then to work. *Id.* at 30, 34. He drove off to work, returning to his mother's house later that night after his shift ended. *Id.* at 30.

The next day, Ryan needed to deposit his tip money and decided to take his mother's car to the bank. *Id.* at 11–12. As soon as he got in the car, he noticed something was wrong, even though he had used the car just the previous evening. *Id.* at 12, 14–15. Ryan asked Tyler whether he crashed the car, which Tyler denied. *Id.* at 11–12. The two brothers chatted on the porch, and Ryan saw that Tyler had the punch jug. Ryan immediately told Tyler that the jug contained windshield wiper fluid. *Id.* at 29. He told Tyler "[d]o not drink that, that is not Hawaiian punch. That is windshield wiper fluid." *Id.* at 39. Ryan directly asked Tyler if he had consumed any of the fluid, but Tyler stated that he had not. *Id.*

Later in the day, Tyler and his mother got into a heated dispute over the condition of the car. [R. 88-5 at 14]. A witness to the altercation noticed that "there was something wrong with Tyler," that "he wasn't himself," and that "he was confused and disoriented." *Id.* at 16. This same witness remarked that both Tyler and his mom were "alcoholics" and "appeared to be under something" when he saw them on May 16, 2022. *Id.* at 16–17. At some point, Tyler called the police regarding the dispute with his mother. *See* [R. 88-7]. John Skidmore, a deputy of the Powell County Sheriff's Department, responded to the call. When he arrived, he immediately suspected that Tyler was under the influence and asked him whether he was on drugs. [R. 88-9 at 9]. Specifically, Skidmore suspected that Tyler was on methamphetamine because he was "jittery, moving back and forth, [and] jabbering." *Id.* at 9, 21. After a short conversation, Tyler stated that he wanted to return to bed and go to sleep. Skidmore got into his cruiser to leave the property. Tyler then struck Skidmore's car with enough force that Skidmore thought the window

2

popped out. *Id.* at 9. Skidmore promptly arrested Tyler for public intoxication around 8:10 p.m. and transported him to the Powell County Detention Center. *Id.* at 15.

Christian Adams was the booking officer at the Detention Center when Tyler arrived. [R. 88-12 at 8]. Adams went through an intake questionnaire with Tyler. Tyler admitted drinking alcohol the previous evening but otherwise did not tell Adams or any other staff that he had consumed anything else, including the wiper fluid. *Id.* at 15. Adams and deputy jailer George Nester both stated that "there was nothing abnormal" about Tyler's behavior. *Id.* at 19; [R. 82-14 at 11]. Nester then administered a voluntary drug screen, which came back negative.[2] [R. 88-15]. Adams and Nester proceeded as usual and booked Tyler into Cell 260. [R. 82-14 at 12].

Ashley Schirmer, Tyler's sister, got off work at 10:00 p.m. that night and went to the Detention Center to see if she needed to bring Tyler's medication to him.[3] [R. 82-16 at 14]. According to Ashley's recollection of her visit, Nester met her in the jail lobby, recounted what Tyler was in for, and reported "that [Tyler] had drank spiked Kool-Aid." *Id.* Ashley then left the jail and spoke with Ryan, informing him that Tyler was in jail due to public intoxication from drinking "spiked Kool-Aid." *Id.* at 15. Ryan told Ashley about the windshield wiper fluid in the juice jug, and the siblings suspected that Tyler may have drank the wiper fluid. *Id.* Ashley returned to the Detention Center and told Nester that she believed Tyler drank windshield wiper fluid. *Id.* at 15. Nester reassured Ashley that jail staff would look into it. *Id.* at 16; [R. 82-14 at 11, 56].

---

[2] Relevant to this point is the fact that Deputy Skidmore arrested Tyler for public intoxication of a substance other than alcohol, which is a separate offense from an alcohol-related public intoxication. [R. 88-10]; *see also* Ky. Rev. Stat. § 525.100 ("A person is guilty of public intoxication when he appears in a public place manifestly under the influence of a controlled substance, or other intoxicating substance, excluding alcohol").
[3] Tyler suffers from bipolar disorder and schizophrenia. [R. 88-4 at 11].

Ashley then departed the jail for a second time. In her haste to return home she ran a stop sign and Sheriff Danny Rogers pulled her over. *Id.* at 16–17. They then discussed Tyler's arrest. There is a factual dispute in the record regarding the extent of the conversation between Sheriff Rogers and Ashley. According to Ashley, Sheriff Rogers said, "I'll send somebody over there to check on him right away" and that Tyler "should be getting out in a couple of hours since he's clean." *Id.* at 17. Sheriff Rogers recalled the conversation differently:

> I asked her what was wrong, and she said that they had arrested her brother and drank windshield washer fluid. So, I asked her did she tell – she just come from the jail. So, I asked her did she tell the deputies at the jail that, and she said yeah, and I made a point to ask her twice, did she – to make sure she told them that, and she said yes, she did.

[R. 82-21 at 12]. Further, Sheriff Rogers denied that he promised Ashley he would relay the information about Tyler to the jail staff. *Id.* at 12–13.

Meanwhile, back at the jail, Nester and oncoming third shift deputy John David Case decided to follow up on Ashley's report and check on Tyler. They initially asked him whether he had consumed anything out of the ordinary that day. According to Case, Tyler said "I don't think I drank anything." [R. 88-14 at 13]. Nester similarly reported that Tyler denied drinking anything. [R. 82-14 at 25]. Case asked Tyler if he wanted to see medical staff and he said he did not. [R. 88-14 at 12]. According to Case, Tyler "seemed 100 percent fine." *Id.* After some further prodding, Tyler told the deputy jailers that he "had only taken a sip from something in his mother's car around 9:30 a.m.," and that it "tasted good" when asked if the liquid tasted bad. [R. 82-5]. After speaking with Tyler, Case told incoming third shift supervisor Holly Drake that Tyler "looked good" and required no further action. [R. 88-14 at 19]. Nester remarked that Tyler showed no signs or symptoms, was verbal, and could talk normally. [R. 82-14 at 12].

4

The Detention Center contracted with a company that provided nursing services and personnel. [R. 82-18 at 13]. Nurses regularly worked from 8:00 a.m. to 8:00 p.m. but were also on call 24 hours a day to respond to medical inquiries from jail staff. *Id.* at 16. Chrissen Meade, one such nurse, testified that she was on call that night and had clocked in and out of the Detention Center between May 15th and 17th. *Id.* at 21. No one at the Detention Center contacted her regarding Tyler's suspected poisoning. She testified at her deposition that it would be impossible to determine if someone was suffering from poisoning just by visually observing them. *Id.* at 22–23. Nester decided against calling the nurse, reasoning that she was off-duty and that he felt that the physical observation he and Case performed was sufficient. [R. 82-14 at 13–14]. Nester testified that he felt that calling the nurse was only necessary if an inmate was "in distress" and offered, by way of example, an inmate reporting that they had chest pains. *Id.* at 24–25.

At 11:09 p.m., a magistrate issued Tyler's release order pursuant to Supreme Court Order 2017-1. [R. 88-18]. The language of the Supreme Court Order spells out two release options for defendants charged with a non-violent misdemeanor, such as public intoxication. First, the defendant can be released "to an adult who is willing to accept responsibility for the defendant." *Id.* Second, a defendant can be released "at such time as [they] are able to safely care for himself or herself but in no event shall the defendant be detained for more than eight (8) hours following his or her arrest." *Id.* Both parties agree that this "eight-hour" window expired at 4:30 a.m. on March 17. The Detention Center staff did not release Tyler at 4:30 a.m., however. First shift supervisor James Cook, who arrived before first shift started at 7:00 a.m., was told that staff did not release Tyler because he was "too wild," which Cook took to mean that he was still too intoxicated. [82-24 at 43]. Cook inferred that staff did not feel comfortable releasing Tyler under

5

the second option, and because there was "nobody there to pick him up," he stayed in the

Detention Center pending his release to a competent adult. *Id.*

Ashley returned to the jail to pick up Tyle before 11:00 a.m. on May 17. [R. 82-16 at 23]. There are facts in dispute regarding Tyler's pickup. Ashley asserts that Tyler could not see and could not walk without her assistance. *Id.* at 23–25. The defendants paint a different picture. According to the defendants, video footage minutes before Ashley's arrival captures Tyler "exiting his holding cell, walking into a private room to change clothes, and exiting the booking area to the lobby," and otherwise behaving normally. [R. 88-1 at 8]. After picking him up, Ashley took Tyler to the University of Kentucky medical center. By the time they arrived, Tyler was sweating profusely, his lips turned purple, and his eyes were rolling back into his head. [R. 82-16 at 28–30]. Tyler went into a coma, stayed at the hospital for more than two weeks, and no longer functions as he once did. [R. 82 at 10].

## II

Under Rule 56, summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A fact's materiality is determined by the substantive law, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

6

a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 535 (6th Cir. 1995) (quoting *Liberty Lobby*, 477 U.S. at 255).

The parties have both made motions for summary judgment. [Rs. 82, 88]. The standard does not change simply because "both parties seek to resolve [the] case through the vehicle of cross-motions for summary judgment." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). The Court need not wholly resolve the case at this stage just because both parties filed cross-motions for summary judgment. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001). The fact that both parties filed cross-motions "does not constitute an agreement that if one [motion] is rejected the other is necessarily justified." *Id.* When both parties move for summary judgment, the Court considers each motion independently and draws all factual inferences against the party whose motion the Court is considering. *Taft Broadcasting*, 929 F.2d at 248.

As a preliminary matter, the Court addresses whether Schirmer abandoned the claims that he failed to defend in his response to the defendants' motion for summary judgment. "A plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases). Defendants argue that summary judgment is uncontested as to Crabtree, Hamilton, Adams, Combs, and Skidmore. [R. 102 at 1–2]. Defendants addressed the claims against these defendants, yet Plaintiff failed to defend the claims against any of these defendants in his reply.[4] Accordingly, this Court will follow the Sixth Circuit's instruction in *Brown* that a

---

[4] Plaintiff mentions Hamilton just once, and insignificantly, in his Response. [R. 95 at 24]. Plaintiff mentions Adams once in reference to training hours. *Id.* at 23. Plaintiff does not mention Crabtree, Combs, or Skidmore whatsoever. In his own summary judgment motion, Schirmer focuses only on Drake, Cook, Nester, and Rogers. *See* [R. 82].

plaintiff abandons their claim when they fail to address them in Response to a summary judgment motion. 545 F. App'x at 372. Schirmer thus abandoned his claims against defendants Crabtree, Hamilton, Adams, Combs, and Skidmore, and the Court **GRANTS** summary judgment for the defendants as to those defendants.

The record in this case is substantial. The crossing motions for summary judgment, alone, contain 2,232 pages of briefing, deposition testimony, and other evidence. The responses and replies to the crossing motions append dozens of pages of additional argument. Given the sheer number of issues, jurisdictional differences, and standards of review, the Court finds it necessary to provide a roadmap of the Memorandum Opinion. Part A addresses defendants' qualified immunity defense. Part B addresses *Monell* liability. Qualified immunity and *Monell* liability ultimately dispose of these crossing motions. Part C evaluates the Defendants' remaining summary judgment claim as it pertains to the liability of Sheriff Rogers, analyzed separately from the qualified immunity analysis.

**A**

The Court first turns to the issue of qualified immunity. All defendants raised qualified immunity in response to Schirmer's summary judgment motion. [R. 96 at 15]. Federal "[q]ualified immunity operates to shield government officials from liability for their actions unless the officials are on notice that those actions are unlawful." *Howell*, 67 F.4th at 317 (citing *Occupy Nashville v. Haslam*, 769 F.3d 434, 441–42 (6th Cir. 2014)). "Such immunity 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (quoting *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)). A qualified immunity defense is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526

(1985). The ultimate "burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). The district court reviews a qualified immunity claim as a question of law. *Mitchell*, 472 U.S. at 528.

To resolve a government official's qualified immunity claim, a district court must address two questions. One, the court determines whether the facts, as alleged by the plaintiff, constitute a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Two, "the court must decide whether the right at issue was 'clearly established' at the time of the defendant's misconduct." *Id.* The Supreme Court instructs that a district court may address these two issues in either order. *Id.* at 236. The Court applies this framework to the arguments presented by the defendants in their motion for summary judgment. In Subpart 1, the Court addresses whether qualified immunity shields the defendants from the federal medical indifference claims. In Subpart 2, the Court reviews the federal claims for untimely release. Subpart 3 analyzes the remaining state law claims.

**1**

Schirmer brought his Fourteenth Amendment medical deliberate indifference claims under the vehicle of 42 U.S.C. § 1983. As to this issue, the Court need only address the "clearly established" prong without deciding whether Nester, Rogers, or any other Powell County defendants violated Schirmer's constitutional rights. That is because the Court is convinced that the alleged unconstitutionality of the defendants' conduct was not "beyond dispute – as it must be to rebut [the] qualified immunity defense." *Beck v. Hamblen County, Tennessee*, 969 F.3d 592, 599 (6th Cir. 2020). But first, in Subpart i, the Court provides the legal background

9

informing the analysis of a claim for deliberate medical indifference. Subpart ii then applies the law of qualified immunity to Schirmer's medical indifference claims.

**i**

The Fourteenth Amendment's due process clause requires government officials to provide adequate medical care to pretrial detainees. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Relatedly, pretrial detainees have a Fourteenth Amendment right to be free from deliberate indifference to serious medical needs. *Griffith v. Franklin Cnty.*, 975 F.3d 554, 566 (6th Cir. 2020). Schirmer must show that (1) he had an objectively serious medical need; and (2) that Rogers' and Nester's actions (or lack thereof) were intentional (not accidental) and they either (a) acted intentionally to ignore Schirmer's serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to Schirmer. *Greene v. Crawford Cnty.*, 22 F.4th 593, 607 (6th Cir. 2022) (citing *Brawner v. Scott Cnty.*, 14 F.4th 585, 597 (6th Cir. 2021)).

The first prong—the "objectively serious" prong—is relatively straightforward. An objectively serious medical need is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Grote v. Kenton Cnty.*, 85 F.4th 397, 406 (6th Cir. 2023). Schirmer argues that a lay person would recognize that the confirmed ingestion of windshield wiper fluid is an event requiring a doctor's attention. Defendants argue that the objective prong is unsatisfied because Schirmer was arrested for public intoxication and that it was not apparent that there was an objectively serious medical need. [R. 96 at 5–8]. Instead, he appeared as a run-of-the-mill intoxicated detainee. *Id.* at 6. They also argue that the facts show that Schirmer concealed what

10

he had done from his family and jail staff, even when asked directly whether he had ingested a dangerous substance. *Id.* at 7.

Defendants cite several cases that, in their view, stand for the position that no objective serious medical need exists when a detainee simply appears intoxicated. In *Smith v. Pike Cnty.*, 338 F. App'x 481 (6th Cir. 2009), the Sixth Circuit reviewed a case where a detainee died from an overdose of hydrocodone and oxycodone. The detainee appeared intoxicated throughout her stay in jail, but was able to "walk, sign her name, and respond to questions, albeit with some difficulty[.]" *Id.* at 481. The Circuit Court affirmed the lower court's grant of summary judgment for the defendants, stating that while the detainee appeared intoxicated that appearance alone was not enough to qualify as a serious objective need. *Id.* at 482 ("Jail personnel had no indication that she was experiencing an overdose, and she did not appear to exhibit symptoms that would make it objectively clear that she had overdosed or was in immediate need of medical attention."). Defendants also cite *Border v. Trumbull Cnty. Bd. of Comm'rs*, 414 F. App'x 831 (6th Cir. 2011), which collected cases holding that "a pretrial detainee's generalized state of intoxication, without more, is insufficient to establish a serious medical need or an officer's deliberate indifference to a substantial risk of serious harm to a detainee." *Id.* at 837. Several of the cases surveyed by *Border* held that defendant officers were not deliberately indifferent to a detainee's medical needs where the detainee denied ingesting harmful substances. *See, e.g.*, *Weaver v. Shadoan*, 340 F.3d 398, 411 (6th Cir. 2003) (no deliberate indifference where detainee repeatedly denied swallowing drugs and refused an offer to be taken to the hospital); *Watkins v. City of Battle Creek*, 273 F.3d 682, 685–86 (6th Cir. 2001) (no deliberate indifference where detainee denied multiple times that he had swallowed drugs).

Indeed, defendants suggest that an "obvious" serious medical need necessarily means that the detainee must show outward signs of distress. [R. 96 at 8]. The Sixth Circuit has characterized outward signs of distress as one of the "hallmarks of an objectively serious medical need." *Grote*, 85 F.4th at 407 (noting there were "signs of outward distress," "clear indications of either a drug overdose or withdrawal," and that officers recognized the need for medical intervention). Schirmer argues on reply that defendants cannot rely solely on Tyler's physical appearance and lack of outward signs. [R. 99 at 4]. Schirmer suggests that it is enough that Ashley told Nester and Rogers that Tyler may have consumed wiper fluid, and cites *Howell v. NaphCare, Inc.*, 67 F.4th 302 (6th Cir. 2023), in support of this contention. *Id.* at 311 ("An objectively serious medical need includes conditions . . . that are so obvious that even a lay person would easily recognize the necessity for a doctor's care.").

The *Howell* court reversed a summary judgment order, finding that a reasonable jury could find that the defendants failed to act to mitigate risk of harm that a reasonable official would have recognized. But *Howell* is distinguishable from the facts of this case. First, Howell had clear outward signs of physical distress. He repeatedly "exclaimed that he was in pain," "rated his pain a ten-out-of-ten," and complained repeatedly that his "legs wouldn't work." *Id.* at 308. Howell also told a responding nurse that he had sickle cell disease, and the nurse confirmed this fact by reviewing his medical chart. *Id.* at 312. This point is key. The Court held that a jury could find the nurse failed to act because she both knew of his existing illness *and* she "heard him make repeated complaints synonymous with sickle cell illness." *Id.* 314. The nurse did not merely suspect Howell of having sickle cell, he affirmatively told her and she confirmed it by checking his medical chart. Contrast this to the facts here, where Schirmer repeatedly denied

12

ingesting anything dangerous, acted and appeared normal to multiple deputy jailers, and never complained of pain or even appeared to be in pain.

Here, Schirmer did not appear to be in any physical distress, did not ask for medical help, and refused the opportunity to see medical staff when offered. Ashley—a third party—told Nester about the suspected ingestion of wiper fluid, prompting Nester and Case to meet with Tyler and "check him out." When they met with him, Tyler denied ingesting anything poisonous or harmful. Every case surveyed by the Court involved clear and overt physical sign of danger. *See, e.g., Border*, 414 F. App'x at 832–33 (detainee was slumped over, had labored breathing, lost control of his bladder, and where other inmates alerted officers to his condition); *Howell*, 67 F.4th at 308 (detainee exclaimed he was in pain, could not support himself in wheelchair, and where nurse was aware of confirmed existing sickle cell disease); *Grote*, 85 F.4th at 401–02 (detainee could not hold still and could not complete paperwork while standing, was profusely sweating and twitching, and later went into a seizure); *Greene*, 22 F.4th at 609 (detainee had not slept for 24 hours and suffered from severe hallucinations). Additionally, none of these cases hold that suspicion of poisoning by a single third-party family member rises to the level of an objective serious medical need, particularly where the jailers followed up on the tip.

As to the second prong, Schirmer must show that the defendants' actions (or lack thereof) were intentional, rather than accidental, and they either (a) acted intentionally to ignore Schirmer's serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to Schirmer. *Greene*, 22 F.4th at 607. The parties do not dispute whether the actions taken were intentional or accidental. It is clear that jail staff opted against calling Nurse Meade, for example. Instead, the parties dispute whether Nester recklessly failed to act reasonably to mitigate the risk of serious medical need posed to Schirmer.

The Sixth Circuit's standard in evaluating the subjective prong of deliberate indifference claims has been "anything but clear." *Hulon v. City of Lansing, Michigan*, No. 23-1937, 2025 WL 817492, at *3 (6th Cir. Mar. 14, 2025). In *Brawner*, the Circuit concluded that recent Supreme Court decisions required a modification of the subjective prong. *Brawner*, 14 F.4th at 596. After *Brawner*, the Circuit returned to the issue in *Trozzi v. Lake County*, where the Circuit held that district courts still needed "to consider the jail official's personal knowledge when applying the deliberate indifference prong." 29 F.4th 745, 754–55 (6th Cir. 2022). But just one year later, the Circuit refused to follow *Trozzi*'s modified test, settling instead on the requirement that plaintiffs must prove that each defendant acted "recklessly in the face of an unjustifiably high risk of harm that is . . . so obvious it should be known." *Helphestine v. Lewis County*, 60 F.4th 305, 315–16 (6th Cir. 2023). The court in *Helphenstine* explained the subjective prong by way of example. *Id.* at 317. They recounted the facts and holding of *Greene*, where they previously held that a reasonable jury could find that several defendants recklessly failed to act reasonably by not seeking medical assistance for a detainee who was clearly physically suffering from alcohol withdrawals. *Id.* The Court repeated *Greene*'s holding that "at a certain point, bare minimum observation ceases to be constitutionally adequate," referring to the detainee's three-day confinement in jail with no medical assistance despite the visible outward signs that the detainee was suffering a medical emergency. *Id.*

The Court then applied the *Greene* rubric to the several named defendants. The court determined that a reasonable jury could find that four defendants acted with reasonable indifference, largely focusing on the fact that these defendants physically witnessed the suffering of the detainee and did nothing. *Id.* at 317–20. The Court noted that "these defendants observed Helphestine in a near-lifeless state after days of illness. A jury could reasonably conclude that

they recklessly failed to act reasonably by not seeking medical assistance for Helphestine." *Id.* at 320. One of the defendants argued that she did not know of any risk because the detainee was coherent, responsive, and improving. *Id.* The Court dismissed this argument, noting that "she should have known he was urgently in need of medical care . . . when she observed Helphenstine unmoving and unable to lift his own head to drink[.]" *Id.*

The Sixth Circuit held in *Grote* that plaintiffs do not need to prove that defendants were aware of the fact that a detainee had ingested a harmful substance to show that the defendants recklessly disregarded the detainee's serious medical needs. *Grote*, 85 F.4th at 409. There, the Court held that the defendants acted recklessly where they ignored symptoms such as uncontrolled shaking and hyperventilation that suggested the necessity of immediate medical attention. *Id.* at 410. The *Grote* court also made observations about a case such as this, where "the [detainee] denied ingesting [a harmful substance] and the defendants' knowledge of whether the person ingested [a harmful substance] was a critical piece of information necessary to appreciate the medical need. This was so because the medical distress was not obvious." *Id.* In such cases, a defendant cannot rely on their own lack of information if it is obvious that something is seriously wrong with the detainee. *Id.*

### ii

With the legal background of medical indifference claims in mind, the Court now turns to whether the defendants enjoy qualified immunity as to this charge. "In evaluating whether a constitutional right was clearly established, '[t]he key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional.'" *Stoudemire v. Michigan Dep't of Corrections*, 705 F.3d 560, 568 (quoting *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009)). The Supreme Court requires that

15

the right be "sufficiently clear" such that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court must examine existing precedent and determine whether the cases "place[] the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In other words, the Court must determine whether the defendants violated a "clearly established" legal rule. *Pearson*, 555 U.S. at 232. A prior case need not be factually identical in every respect to the plaintiff's case to create a clearly established rule. *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019). But a prior case must contain a fact pattern that is "similar enough to have given 'fair and clear warning to officers' about what the law requires." *Id.* at 279. A rule "is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates' the rule." *Beck*, 969 F.3d at 599 (citing *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (per curiam)). "It is not enough that the rule is *suggested* by then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (emphasis added). Instead, the rule must be settled law, "dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.*

This is a high bar to clear. The plaintiff must identify with a high degree of specificity the legal rule that the officials allegedly violated. *Beck*, 969 F.3d at 599. The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Id.* (citing *City and Couty of San Francisco v. Shaheen*, 575 U.S. 600, 613 (2015)). In the context of a deliberate indifference to medical care case, the Sixth Circuit recognizes generally "that pretrial detainees have a right to receive care for serious medical needs." *Id.* at 600. But in *Arrington-Bey v. City of Bedford Heights, Ohio*, the Sixth Circuit found that such a description of the claimed right is too general. 858 F.3d at 992–93. There, the Circuit held that "a plaintiff must identify a

16

case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id.* at 993. The Circuit could not find a similar-enough case establishing that those officials needed to seek immediate medical attention for an individual in the circumstances they confronted and accordingly reversed the lower court's ruling denying qualified immunity. *Id.* at 993–94, 996.

In his initial reply in support of his own summary judgment motion, in just six sentences and with no citation to legal authority Schirmer attempted to sidestep this requirement to define the violated right using a clearly established rule. [R. 99 at 9–10]. Schirmer's attempt to define the clearly established rule is only slightly better argued in opposition to the defendants' motion. There, Schirmer suggests framing the rule as "prison officials who have been alerted to a prisoners' serious medical needs are under an obligation to offer medical care to such a prisoner." [R. 95 at 18]. In support of this proposed rule, Schirmer cites a single case: *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001).

The facts of *Comstock* differ substantially from the facts of this case. *Comstock* involved the suicide of a Michigan state prisoner, Billy Montgomery. *Id.* at 699. The district court concluded that three officials—McCrary, Howell, and Thyagarajan—were not protected from suit by qualified immunity. *Id.* at 698. McCrary, a psychologist, evaluated Montgomery and determined that he needed to be placed on suicide watch. McCrary took extensive notes on his interaction with Montgomery, which confirmed that Montgomery expressed some suicidal tendencies. Howell, a physician's assistant, met with Montgomery the next day and issued a progress report concluding that Montgomery did not exhibit any psychotic signs or symptoms. In this report, Howell noted that Montgomery did not appear suicidal but was rather worried that other inmates had threatened to kill him because they believed he collaborated with law

17

enforcement. *Id.* Howell did not have access to McCrary's notes but was otherwise aware that Montgomery was on suicide watch. Dr. Thyagarajan, Howell's supervisor, signed off on Howell's report without evaluating Montgomery himself or looking at his medical records.

McCrary then met with Montgomery again and took him off of suicide watch supported by his answers to McCrary's questions. Montgomery denied feeling suicidal and McCrary "took him at his word." *Id.* at 699. After officials moved Montgomery back to his regular cell, he committed suicide and drafted a suicide note to his girlfriend in which he wrote, "I couldn't let them do it to me," in reference to other prisoners. *Id.* Montgomery's estate then brought suit against the three officials. The estate argued that McCrary's "failure to perform a more thorough psychological examination, which would have revealed that Montgomery had been labeled a snitch and that his suicidal urge was motivated by his fear of other inmates, amounted to deliberate indifference to Montgomery's serious medical needs." *Id.* at 700. In evaluating the second prong of the qualified immunity analysis, the Circuit Court identified the right as the right to "continuing medical treatment once a prisoner has been determined to be suicidal," citing several prior cases identifying this unfortunately common factual predicate in our country's prisons. *Id.* at 711 (collecting cases). The Circuit ultimately concluded that "a reasonable prison psychologist in 1995 'would have clearly understood that he was under an affirmative duty' to offer reasonable medical care to a prisoner whom he knew to be suicidal, in the circumstances confronted by McCrary." *Id.* (citation omitted).

There are several reasons why the *Comstock* decision falls short in declaring the well-established rule upon which Schirmer tries to rely. First, and most obviously, the factual predicate of the *Comstock* case has almost nothing to do with the facts of this case. *Comstock* does not contain a fact pattern that is "similar enough to have given fair and clear warning" to the

Powell County defendants about what the law requires. *Arrington-Bey*, 858 F.3d at 993. Second, Schirmer defines the proposed rule at too high a level of generality. *Beck*, 969 F.3d at 599. In some circumstances, it is undoubtedly true that jail officials who have been alerted to a detainee's serious medical needs are under an obligation to offer medical care to such a detainee. But the cases surveyed by the Court all involved outward physical signs of clear medical distress that were ignored by officials. *See Border*, 414 F. App'x at 832–33; *Howell*, 67 F.4th at 308; *Grote*, 85 F.4th at 401–02; *Greene*, 22 F.4th at 609. A prison official who chooses to ignore a detainee writhing on the ground and foaming at the mouth, for example, has an obligation to offer medical care to that detainee under the clearly established caselaw. It is far from clear that any such obligation exists where the detainee exhibits no signs of medical distress, repeatedly denies ingesting a harmful substance, denies offers to see a medical professional, and otherwise behaves normally.

Schirmer further fails to identify that Sixth Circuit precedent has anything to say about how an official should handle uncorroborated reports from a third-party. Schirmer cites an unreported case from the Central District of California, *Enyart v. Cnty. of San Bernardino*, No. 5:23-CV-00540-RGK-SHK, 2024 WL 2104489 (C.D. Cal. Apr. 22, 2024). This case comes closer to the factual issues at play but is distinguishable on both the facts and the law.

The case began with the arrest of William Enyart on July 27, 2022. *Id.* at *1.While the police struggled to arrest William, his family pleaded with officers to take William to the hospital on the belief that he could suffer fatal alcohol withdrawal symptoms. *Id.* at *2. The police actually called paramedics to the scene who determined he was in stable condition. Once at the jail William filled out an intake questionnaire where he denied using alcohol or drugs. The County's intake procedures also required the arresting officer to complete a questionnaire, and

19

the arresting officer inexplicably answered "no" when asked if he was aware whether William was under the influence of drugs or alcohol, despite the circumstances known to officer himself.[5] *Id.* In the hours after his arrest, William's family members spoke to the arresting officer on the phone and made "numerous phone calls to the County jail and other related entities" over the following five days. William remained in jail for several days. By July 30—three days after his arrest—he exhibited "strange behavior and appeared manic, disorganized, paranoid, and delusional." *Id.* at *3. Based on these symptoms, officials actually moved him to a facility with better medical and mental healthcare services. His health continued to decline, and William died in custody on August 1, 2022, five days after his initial arrest.

The *Enyart* court ultimately denied the defendants' summary judgment motion on the basis that significant triable issues of fact remained and that a reasonable jury could conclude that the defendants acted with deliberate indifference by failing to relay the concerns from William's family to jail staff. *Id.* at *7. The similarities are clear. Both Schirmer's case and *Enyart* involve family reports to a government official about a suspected medical issue. In both cases, the plaintiff detainees denied disclosing issues involving the ingestion of harmful substances. Both cases squarely involve a claim of deliberate medical indifference in the face of outside reports.

But there are also striking contrasts. First, the defendant officers in *Enyart* failed to follow up in any meaningful way on the reports that they received over several days' time. Compare this to Schirmer's case, where Nester received a single tip but then took steps to authenticate the report by speaking with Tyler and observing him. Second, the detainee's health in *Enyart* worsened rapidly over the course of several days, leading to his eventual transfer to a

---

[5] The arresting officer had to physically subdue William during the arrest and testified that he smelled alcohol on his breath and believed he was intoxicated. *Enyart*, 2024 WL 2104489, at *2.

better-equipped jail facility in direct response to his deteriorating medical condition. Under the deliberate indifference medical standard followed in the Sixth Circuit, this would have clearly been obvious to any reasonable official that medical intervention was necessary. Compare this again to the case at bar, where no such visible deterioration occurred and where Tyler was only in custody for an evening, not five days as in *Enyart*.

But the Court need not even compare and contrast *Enyart* to the facts of this case. That is because the Sixth Circuit is clear that a case such as *Enyart* has no impact on a qualified immunity analysis. Schirmer must produce an on-point, binding case standing for the proposition that clearly established law required the Powell County defendants to go further than they did in responding to Ashley's claims. *See Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022). Schirmer cannot rely on *Enyart*—an unpublished opinion in a California district court—to do so. The Sixth Circuit has repeatedly affirmed that officials "in our circuit aren't expected to stay abreast of the varying and ever-changing law of other circuits—especially not unpublished opinions that have no precedential value." *Brown v. Giles*, 95 F.4th 436, 440 (6th Cir. 2024). The Sixth Circuit instructs that "basic logic" informs the Court that "a plaintiff cannot point to unpublished decisions" in an attempt to argue "whether a right has been clearly established." *Bell*, 37 F.4th at 367–68.

Having addressed Schirmer's cited cases, the Court is not convinced that an established right existed at the time requiring the Powell County defendants to intervene further than they did after receiving Ashley's tip. Through 143 pages of combined briefing, neither party has identified a case sufficiently similar enough to have put the defendants on notice that their actions were illegal. *Vanderhoef*, 938 F.3d at 279. As an additional buttress against Schirmer's claims, the Sixth Circuit's standard in evaluating the subjective prong of deliberate indifference

21

claims has been "anything but clear." *Hulon*, 2025 WL 817492, at *3. The test ostensibly in place at the time of the events was that of *Trozzi*, which the Circuit replaced a year later in *Helphenstine*. *Id.* (describing the Sixth Circuit's rapidly-changing stance on the second prong analysis). The defendants' point that this "surrounding uncertainty" informs the "clearly established" analysis required for qualified immunity claims is well-taken.

The Court concludes that the alleged unconstitutionality of the defendants' conduct was not "beyond dispute – as it must be to rebut [the] qualified immunity defense." *Beck*, 969 F.3d at 599. Having satisfied this prong of the qualified immunity analysis, there is no need to go further and evaluate whether Nester, Rogers, or any of the other Powell County defendants actually violated Schirmer's constitutional rights. *Pearson*, 555 U.S. at 236.

**2**

Next, the Court addresses Schirmer's federal "untimely release" claims. Again, the Court provides the legal background of such claims in Subpart i, then turns to the qualified immunity analysis in subpart ii.

**i**

Schirmer brought a § 1983 action against defendants Holly Drake and James Cook on the basis that these defendants violated Schirmer's right to timely release under the United States Constitution. [R. 82-1 at 16]. Schirmer alleges that these same violations also run afoul of Kentucky state law. While jurisdictionally different, the Court considers the general claim in tandem given their intertwined relationship to one another and the shared factual basis underpinning the arguments.

"When a prisoner's sentence has expired, he is entitled to release." *Shorts v. Bartholomew*, 255 F. App'x 46, 51 (6th Cir. 2007). Many of the cases reviewed by this and other

22

courts involve Eighth Amendment issues regarding the release of prisoners serving a term upon conviction. *See, e.g., id.* (involving a sentence calculation confusion); *Schultz v. Egan*, 103 F. App'x 437 (2d Cir. 2004) (involving a miscalculation claim); *Jones v. Bottom*, 85 F.4th 805 (6th Cir. 2023) (plaintiff state prisoner arguing that officials violated Eighth and Fourteenth Amendment rights of incarcerating him beyond the length of his sentence by not taking account of a time-served provision in his plea agreement); *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989) (prisoner improperly held past the completion of his sentence due to a prison records officer's failure to rectify a known issue). The facts of this case differ somewhat because it involves a detainee eligible for release on recognizance under certain conditions. Those conditions are contained in Kentucky Supreme Court Order 2017-01. *See* [R. 88-18]. The relevant part of that order reads as follows:

> Defendants charged with non-violent / non-sexual misdemeanor(s) / violation(s) . . . will be eligible under the Schedule and shall be released on recognizance unless a defendant has been charged with a violation of . . . KRS 525.100 (Public Intoxication), in which case he or she shall be released as follows:
>
> > i. To an adult who is willing to accept responsibility for the defendant through a signature verification on a form prescribed by the Administrative Office of the Courts; or
> >
> > ii. At such time as the defendant is able to safely care for himself or herself but in no event shall the defendant be detained for more than eight (8) hours following his or her arrest; or
> >
> > iii. Unless such person's release is precluded by other provisions of law.

*Id.* The parties dispute the applicability of the order. Much of the argument boils down to the question of whether it legally required Tyler's release after the conclusion of his eight-hour window, around 4 a.m., or whether he could remain in jail pending pickup from a family

23

member. Tyler Schirmer's "Conditions of Release and Judicial Decision" ordered his release on May 16, 2022, at 11:09 p.m. with conditions to not violate any laws and to make his scheduled court appearances. *Id.* Drake logged the release order at 12:24 a.m. on May 17, 2022. [R. 82-4]. Tyler was released to Ashley Schirmer on May 17, 2022, at 10:03 a.m. [R. 82-10].

The defendants contend that Order 2017-01 does not "necessarily mandate the defendant's ejection from the facility after [the] 8-hour timeframe has passed." [R. 96 at 20]. "While nothing requires the jail to keep the defendant after the 8-hour timeframe has ended, nothing likewise precludes the defendant from remaining there for other reasons, such as an accommodation or for convenience." *Id.* Deposition testimony reflects the fact that the Detention Center officials exercise caution before releasing detainees on their own in the middle of the night and that staff often allow inmates to continue sleeping rather than waking them up to release them. [R. 82-22 at 65, 73]. There is further testimony that jail officials were concerned that Schirmer was "too wild to release out," citing the nature of the offense and his striking of the police cruiser and other behavior related to the arrest. *Id.* at 75–76.

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action [or inaction]." *Shorts*, 255 F. App'x at 53 (quoting *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997)). "Deliberate indifference has been demonstrated in those cases where prison officials were put on notice and then simply refused to investigate a prisoner's claim of sentence miscalculation." *Id.* (quoting *Moore v. Tartler*, 986 F.2d 682, 686 (3d Cir. 1993)). The Sixth Circuit adopted a three-part test to establish § 1983 liability in the context of individual deliberate indifference to a timely release claim:

> [A] plaintiff must (1) first demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that

> unwarranted punishment was being, or would be, inflicted. (2) Second, the plaintiff must show that the official either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference to the prisoner's plight. (3) Finally, the plaintiff must demonstrate a causal connection between the official's response to the problem and the infliction of the unjustified detention.

*Id.* at 55 (quoting Sample, 885 F.2d at 1110). As to the first prong, there is no dispute that jail officials were aware of the relevant facts. They were aware of the release order. Schirmer can demonstrate that officials were, at the very least, aware of the fact that under the text of the order, Tyler *qualified* for release. The second prong requires the Court to consider "whether the plaintiff [has shown] that the official either failed to act or took only ineffectual action *under circumstances* indicating that his or her response to the problem was *a product of deliberate indifference* to the prisoner's plight." *Id.* at 55 (emphasis added). For the third prong, Schirmer would need to demonstrate a casual connection between Drake and Cook's response to the problem and the infliction of the allegedly unjustified detention.

**ii**

The issue is whether qualified immunity shields the defendants from Schirmer's federal claims for untimely release. Here, again, the Court focuses on the second prong of the qualified immunity analysis. This requires the Court to "decide whether the right at issue was 'clearly established' at the time of the defendant's misconduct." *Id.* at 232. "In evaluating whether a constitutional right was clearly established, '[t]he key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional.'" *Stoudemire*, 969 F.3d at 599.

What, exactly, is the *right* at issue in Schirmer's untimely release claim? Schirmer borrows *Shorts*' characterization of the right that "when a prisoner's sentence has expired, he is

25

entitled to release." 255 F. App'x at 51. But the Sixth Circuit characterized this conclusion in *Shorts* as having "shaky underpinnings" because it "strikes at a high level of generality, something case law frowns upon." *Jones*, 85 F.4th at 811 (citing *Ashcroft*, 563 U.S. at 742 ("clearly established law should not be defined at a high level of generality")). The Court agrees with the *Jones* court that the right at issue in this case is much narrower than the general proposition espoused in *Shorts*. The right at issue boils down to the only real legal dispute involving the untimely release claims. That is, are county jailers constitutionally required to immediately release a pre-trial detainee upon the entry of a Release Pursuant to Supreme Court Order 2017-1?

It is difficult to believe that a county jailer in 2022 understood that there was a clearly established rule requiring the immediate ejection of a pretrial detainee eligible for release under the terms of Order 2017-1. As an initial point, there is no caselaw or precedent placing this statutory or constitutional question beyond debate. *See Ashcroft*, 563 U.S. at 741. The Court is able to identify just a *single* unpublished case referencing Order 2017-1 in a Kentucky negligence action bearing no similarity to the facts of this suit. *See Troutt v. Bail Project, Inc.*, No. 2023-CA-0171-MR, 2024 WL 1687053, at *1 (Ky. Ct. App. Apr. 19, 2024), *review granted* (Dec. 12, 2024). The precedent cited by both parties—namely *Shorts* and *Jones*—both involved post-conviction prisoners challenging their release dates due to sentence miscalculations. Aside from the general precept that prisoners cannot be held past their release date, these cases offer no guidance to Kentucky county jail officials presented with the situation that confronted the Powell County defendants. The lack of any precedent, particularly from the Kentucky state courts, does not support the existence of a clearly established rule.

26

That conclusion necessitates a discussion of the legal effect of an amended order such as Supreme Court Order 2017-1. Courts have a duty to interpret and enforce the language of a law, including an administrative order, according to its plain-text meaning. *Normandy Farm, LLC v. Kenneth McPeek Racing Stable, Inc.*, 701 S.W.3d 129, 137 (Ky. 2024). "A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 737, 741 (6th Cir. 1999). "On questions of state law, this Court is bound by the rulings of the state supreme court." *Ky. Comm. Mobile Radio Serv. Emergency Telecomms. Bd. v. TracFone Wireless, Inc.*, 712 F.3d 905, 912 (6th Cir. 2013). "In the absence of any state supreme court precedent, a state's appellate court decisions are the best authority." *Id.* "When there is no state law construing a state statute, a federal court must predict how the state's highest court would interpret the statute." *Id.*

Order 2017-1, titled "Authorization for the Non-Financial Uniform Schedule of Bail Administrative Release Program," overhauled the Kentucky Supreme Court's attempts at bail reform. Again, the pertinent text of the Order reads:

> Defendants charged with non-violent/non-sexual misdemeanor(s) /violation(s) whose risk score has been assessed between '2' and '5' (Low Risk) or either '6' or '7' (Moderate Risk) will be eligible under the Schedule and shall be released on recognizance unless a defendant has been charged with a violation of KRS 222.202 (Offenses of Alcohol Intoxication or Drinking Alcoholic Beverages in a Public Place), KRS 525.100 (Public Intoxication), or KRS 189A.010 (Operating Motor Vehicle While Under the Influence), in which case he or she shall be released as follows:
>
> > i. To an adult who is willing to accept responsibility for the defendant through a signature verification on a form prescribed by the Administrative Office of the Courts; or

27

> ii. At such time as the defendant is able to safely care for himself or herself but in no event shall the defendant be detained for more than eight (8) hours following his or her arrest; or
>
> iii. Unless such person's release is precluded by other provisions of law.

[R. 88-18 at 5–6]. Duly promulgated administrative regulations have the force and effect of law. *Sprouse v. Commonwealth*, 662 S.W.3d 304, 307 (Ky. Ct. App. 2023) (citing *Woods v. Commonwealth*, 599 S.W.3d 894, 897 (Ky. App. 2020)). Administrative procedures promulgated by the Chief Justice have the force and effect of law if they are not inconsistent with enabling provisions of the Constitution, with enabling statutes, and with rules adopted by the Supreme Court. *Romero v. Admin. Off. of Cts.*, 157 S.W.3d 638, 639 n.1 (Ky. 2005), *as modified* (Mar. 21, 2005). The Chief Justice serves as the "executive head of the Court of Justice" and "perform[s] all other necessary administrative functions relating to the court." Ky. Const. § 110(5)(b). This includes the power to issue administrative orders such as Order 2017-1.

The Court is unable to find any authority—reported or otherwise—analyzing the effect of Order 2017-1. Research identified just one case in which a Kentucky court mentioned the Order, and only so in passing and without interpretative analysis. *See Troutt*, 2024 WL 1687053, at *1. Other versions of this Order, including the updated order that superseded 2017-1, similarly have no reported cases evaluating its meaning in any way. Having no state authority to rely on, the Court must evaluate the meaning of the order according to its "plain text meaning" and "predict how the state's highest court would interpret the statute." *TracFone Wireless*, 712 F.3d at 912. Two areas of Kentucky law suggest how the Kentucky Supreme Court would interpret Order 2017-1. First, the Court will look to the Supreme Court's treatment of its own orders. Second, the

28

Court will evaluate Kentucky caselaw involving false imprisonment claims against law enforcement officials.

Many of the reported cases addressing Supreme Court orders involve attorney discipline. This comes as no surprise, considering that the Supreme Court governs the legal profession in Kentucky by "prescribe[ing] rules governing . . . [the] rules of practice and procedure for the Court of Justice" and "govern[s] admission to the bar and the discipline of members of the bar." Ky. Const. § 116. The judicial power of Kentucky is vested exclusively in one "Court of Justice," which includes the Supreme Court, Court of Appeals, and lower trial courts. Ky. Const. § 109. Naturally, then, the imposition of a Supreme Court Order such as 2017-1 squarely falls within the "rules of practice and procedure for the Courts of Justice" by establishing a uniform bail administrative release program. But the review of attorney discipline cases has little to say on the issue before the Court, other than confirm that the courts have authority to discipline attorneys who violate a Supreme Court order or rule. *See, e.g., Hipwell v. Kentucky Bar Ass'n*, 267 S.W.3d 682, 684 (Ky. 2008) (violations of SCR 3.130-5.5(a) and 3.130-3.4(c) are actionable). Another case similarly stands for the proposition that Supreme Court orders must be interpreted by "the clear language of the Order," and courts are not "at liberty to extend [an] order's mandate further." *Lookout Heights Civic Club, Inc. v. Kenton Cnty. PVA*, No. 2020-CA-1614-MR, 2021 WL 6058552, at *2 (Ky. Ct. App. Dec. 22, 2021) (rejecting petitioner's argument that Order 2020-17 must be interpreted to extend the filing deadline of administrative appeals, when the Order's text only applied to the Supreme Court and Court of Appeals). Because there is no treatment regarding violations of a pretrial detainee's right to release under 2017-1, the Court must look to common law false imprisonment cases for an appropriate analogue.

29

The Court has identified one case coming closest to Schirmer's false imprisonment claims involving the continued detention of a detainee otherwise lawfully arrested and held. In *Garvin v. Muir*, 306 S.W.2d 256 (Ky. 1957), the Court of Appeals reviewed the entry of a directed verdict in favor of jailers in a false imprisonment case. There, police arrested Garvin for public drunkenness and vagrancy. *Id.* at 257. A series of paperwork errors led to Garvin's incarceration for a period of 25 days without a court order, well past the period of time that Garvin would have served for drunkenness. *Id.* at 257–58. Garvin sued the jailers on a false imprisonment theory, and the circuit court granted the jailers a directed verdict. *Id.* at 258. The Court of Appeals, then Kentucky's highest court, held that the circuit court erred in granting the directed verdict because Garvin served his sentence for drunkenness but was "thereafter held in jail for a period of approximately 25 days when no mittimus or other valid order for his detention had been issued." *Id.* While not reaching the exact legal issues at play in this case, *Garvin* nevertheless instructs that jail staff can only hold a detainee when they act under the auspices of a "valid order."

So, what options did Order 2017-1 give the Powell County jail staff? The plain text presents just two options for a detainee arrested under the public intoxication statute, as Schirmer was. First, under section i, Schirmer could be released "to an adult who is willing to accept responsibility for the defendant through a signature verification on a form prescribed by the Administrative Office of the Courts." [R. 88-18]. The statute then brackets off sections i and ii with a semicolon and the word "or." This is an important distinction, because the conjunction "or" in English is "used as a function word to indicate an *alternative*." *Or*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/or [https://perma.cc/4SZ5-YFH2] (last visited Feb. 11, 2026) (emphasis added). Second, and in the alternative, section ii states that

30

"at such time as the defendant is able to safely care for himself or herself but in no event shall the defendant be detained for more than eight (8) hours following his or her arrest." [R. 88-17]. A third provision, similarly separated by a semicolon and the word "or," states that the detainee need not be released if "such person's release is precluded by other provisions of law." *Id.*

The parties did not raise this point, but the Court cannot avoid concluding that the "eight-hour" provision relates only when the individual is to be released under section ii of Order 2017-1. The deputy jailers chose to release Schirmer under section i, which does not include an eight-hour provision. This does not mean that a jail can indefinitely hold someone on the basis that there is no responsible adult willing to accept responsibility for them. But the Order contains no language instructing officials how to decide between these two options. Interpreting "the clear language of the Order," this Court is not "at liberty to extend [an] order's mandate further." *Lookout Heights Civic Club*, 2021 WL 6058552, at *2. Schirmer would have this Court extend the mandate of Order 2017-1 to require immediate ejection without any regard for the clear difference between the two options presented to jail officials under Order 2017-1. The Court will not do so.

As such, the language of Order 2017-1 seemingly presents jailers with one of two options. First, they could release the detainee "to an adult who is willing to accept responsibility for the defendant" or, second, they could release the detainee "at such time as the defendant is able to safely care for himself or herself but in no event shall the defendant be detained for more than eight (8) hours following his or her arrest[.]" [R. 88-18]. By its literal terms, the eight-hour requirement appears only in the second option. The Powell County defendants released Tyler under the first option, requiring an adult who was willing to accept responsibility for him.[6]

---

[6] It is worth noting that Tyler's mother first called Ashley at 8:30 a.m. requesting that Ashley pick up Tyler from jail. [R. 88-20]. Ashley missed the call and did not get the message until 10 a.m. [R. 82-16 at 99–100].

31

Following this first option, jail staff released Schirmer into the care of his sister Ashley on the morning of the 17th. [R. 82-16 at 23]. The language of the Order does not support the existence of the clearly established rule that Schirmer needs to overcome qualified immunity.

Finally, the deposition testimony in this case suggests great uncertainty regarding the requirements under Order 2017-1. In his representative capacity, Neal Hamilton testified to the Powell County Detention Center's policies regarding an "ROR," or a release order under 2017-1. [R. 82-22 at 73–76]. Hamilton testified that the procedure is far from uniform and rather reflects the circumstances of each individual detainee. He stated that "if it's somebody that's extremely [inebriated], we'll tell them, 'Hey, you've got a ROR but you need somebody to come and pick you up.'" *Id.* at 73 (modified for clarity). He said the time of day also impacts release procedure: "if it's daytime, everybody's awake, we'll go get them . . . if it's at nighttime, we'll usually let them sleep, and the next morning we'll tell them, 'Hey, you know, you can call somebody to come and get you.'" *Id.* Mitchell Lucas, Schirmer's proposed expert jail witness, testified that this is incorrect, and that "at the end of the eight hours, [the jail] is supposed to let him out the door," but clarified that his interpretation of the Order is based solely on its text and not on any other provisions of Kentucky law or case precedent. [R. 82-20 at 101, 103]. Lucas did not offer any testimony as to the textual differences between the two options, as written in Order 2017-1. This difference of opinion between the jail's representative and an opinion witness supports a finding that no clearly established rule existed dictating the constitutional responsibility of a deputy jailer to *immediately* eject a detainee once they received a release order pursuant to 2017-1.

To overcome a claim of qualified immunity, Schirmer must show that the unconstitutionality of the defendants' actions was beyond dispute. He has not done so. The

proposed right, properly tailored to the circumstances of this case, was not "sufficiently clear" such that a reasonable deputy jailer in 2022 would have understood that holding Schirmer past 4:30 a.m. violated the Fourteenth Amendment of the Constitution. *Anderson*, 483 U.S. at 640. Accordingly, the Powell County defendants enjoy qualified immunity as to Schirmer's untimely release claims brought under federal law.

**3**

The Court now turns to the remaining state law claims. The defendants argue that they are entitled to qualified immunity on Schirmer's state law medical negligence and untimely release claims. [R. 88-1 at 25–28, 28–30]. In subpart i, the Court addresses whether qualified immunity shields the defendants from Schirmer's state law medical negligence claim. In subpart ii, the Court evaluates whether qualified immunity shields the defendants from Schirmer's state law untimely release claim.

**i**

The parties dispute whether the Powell County defendants enjoy qualified immunity under state law. Public officers and employees in Kentucky enjoy qualified immunity "which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Qualified immunity "applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Id.*

Kentucky courts distinguish discretionary acts, which enjoy qualified immunity, from ministerial acts, which do not enjoy such immunity. "Categorizing actions as either the

33

performance of a discretionary duty or the performance of a ministerial duty is vexing to litigants and courts alike." *Patton v. Bickford*, 529 S.W.3d 717, 724 (Ky. 2016). "At their core, discretionary acts are those involving quasi-judicial or policy-making decisions." *Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014). While a clear definition is elusive, the Supreme Court of Kentucky held that "the discretionary category . . . encompass[es] 'the kind of discretion exercised at the operational level rather than exclusively at the policy-making or planning level.'" *Id.* "Most immunity issues are resolved by examining the nature of the functions with which a particular official or class of officials has been lawfully entrusted." *Id.* at 296–97.

Defendants point to state caselaw holding that medical care decisions made by jail staff are discretionary, rather than ministerial. In *Jerauld ex rel. Robinson v. Kroger*, 353 S.W.3d 646 (Ky. App. 2011), the Court of Appeals reviewed the grant of summary judgment in a suit involving the suicide attempt of a jail inmate. The facts of *Jerauld* track closely with those in this case. Police arrested Dustin Jerauld for burglary. Jerauld's father relayed information to the arresting officers that Dustin "had said he might hurt himself." *Id.* at 638. But when Jerauld completed his intake form, he responded that he did not have a desire to hurt himself. Jail officials initially put him in a cell without sheets or pillowcases.

In jail, Jerauld threatened his mother with self-harm over the phone but continued concealing his suicidal idealizations from jail staff. *Id.* He told a staffer that he wanted to be taken off of suicide watch. After meeting with a jail psychologist, jail staff moved him to general population. He later complained that he was suffering from heroin withdrawals. *Id.* Staff met with him and concluded that he was not experiencing withdrawal symptoms but placed him on a list to see the jail's physician the following morning. *Id.* Jerauld continued phoning his parents

34

and his attorney and confiding that he was having suicidal thoughts. *Id.* at 638–39. The next morning, jail staff found Jerauld hanging from his bed sheet. *Id.* at 639.

After a long procedural journey, Jerauld's state law negligence claims wound up before the Kenton County Circuit Court. *Id.* The Circuit Court granted summary judgment to the defendants, finding that they were entitled to qualified immunity. *Id.* The Court of Appeals affirmed the lower court's decision. The Appeals Court noted at the outset that the Kentucky Supreme Court held that "the supervision of prisoners is a *discretionary* act and entitled those in that position to qualified immunity." *Id.* at 640 (citing *Rowan County v. Sloas*, 201 S.W.3d 469 (Ky. 2006) (emphasis added). The Court rejected Jerauld's argument that the defendants were acting in a ministerial capacity, noting that "[i]n this case, [defendants] made decisions regarding Jerauld's suicide risk based on observations they made. Discretionary or judicial duties are such as necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." *Id.* at 641 (quoting *Collins v. Commonwealth of Ky. Natural Resources and Environmental Protection Cabinet*, 10 S.W.3d 122, 125 (Ky. 1999)). The Court further determined that qualified immunity was appropriate because "no task is inherently more discretionary than evaluating actions and behaviors of prisoners and deciding whether they are sufficiently alarming to warrant additional review by . . . other officials." *Id.* (quoting *James v. Wilson*, 95 S.W.3d 875, 910 (Ky. App. 2002)). Caselaw confirms that decisions whether to contact medical staff require judgment and thus are discretionary under Kentucky law. *Williams v. Kenton Cnty., KY*, No. 2:21-CV-080 (WOB-CJS), 2023 WL 2053068, at *15 (E.D. Ky. Feb. 16, 2023); *see also Noble v. Three Forks Reg'l Jail Auth.*, 995 F. Supp. 2d 736, 744 (E.D. Ky. 2014)).

35

Nester clearly performed a discretionary act when he and Case evaluated Schirmer and decided that his behavior and actions were not sufficiently alarming to warrant additional review by Nurse Meade. Nester and Case, as supervisors of prisoners, acted in their discretion regarding Schirmer's medical status based on the observations they made and based on the information that Schirmer disclosed to them through his intake form and cell interview. This decision-making authority at the operational level qualifies as a discretionary, and not ministerial, decision. *Marson*, 438 S.W.3d at 297. The decision of whether or not to pursue further medical intervention for Tyler is a discretionary act shielded by qualified official immunity.

**ii**

The defendants argue that Schirmer's release-related common law claims fail as a matter of law and are in any event are shielded by immunity under Kentucky law. [R. 88-1 at 28]. Again, qualified immunity applies only to the *negligent* performance by a public officer or employee for their good-faith discretionary acts taken within the scope of the employee's authority. *Yanero*, 65 S.W.3d at 522. The structure of Kentucky's immunity test thus requires the Court to first evaluate whether the Powell County defendants were negligent in timely releasing Schirmer.

"The elements of a negligence claim are (1) a legally-cognizable duty, (2) a breach of that duty, (3) causation linking the breach to an injury, and (4) damages." *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016). Duty presents a question of law. *Id.* "The most important factor in determining whether a duty exists is foreseeability." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003). Foreseeability, in this case, asks whether defendants Drake and Cook knew that their "conduct involves a risk of causing an invasion of another's interest if a reasonable man would do so while exercising such attention, perception of the circumstances, memory,

36

knowledge of other pertinent matters, intelligence, and judgments as a reasonable man would have." *Id.* at 90.

The Court earlier addressed the factual and legal background of Schirmer's untimely release claims in Part A(2). Schirmer believes that Supreme Court Order 2017-1 placed an affirmative duty on Drake and Cook to release him once his "eight hours" were up at 4:30 in the morning. Order 2017-1 does place a duty on jailers to release an inmate. But, for the reasons the Court previously articulated, the language of the Order gives jailers discretion in choosing which option to pursue. Under the literal terms of the Order, jailers had two options: They could release Schirmer to "an adult who is willing to accept responsibility for" him, or they could release Schirmer "at such time as the defendant is able to safely care for himself [] but in no event shall the defendant be detained for more than eight (8) hours following his [] arrest." [R. 88-18]. The jailers fulfilled their duty under the terms of the Order when they opted to release Tyler under the first option, taking into account their perception of the circumstances (the time of day and the jail's policy cautioning against releasing detainees in the middle of the night), and their knowledge of other pertinent matters (his arrest for public intoxication and reports from other staff that he was too wild to release on his own). *Hammons*, 113 S.W.3d at 90.

This is quintessentially a judgment call that Kentucky immunity law protects. "[W]hen the performance of the job allows for a governmental employee to make a judgment call . . . the fact that there is uncertainty as to what acts will best fulfill the governmental purpose has resulted in immunity being extended to those acts where the governmental employee must exercise discretion." *Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014). Immunity is thus appropriate here for two reasons. First, and most importantly, the officers did not perform negligently when they released him under the first option of Order 2017-1. Second, even

assuming in arguendo that the release was negligent, Drake and Cook unquestionably made a judgment call of whether to release him on his own recognizance or whether to wait for a competent adult to accept responsibility for him. Under Kentucky law, Drake and Cook are thus entitled to immunity for their actions.

**B**

Count III of Schirmer's second amended complaint alleges municipal liability for Powell County's failure to adequately train, hire, and supervise officers. [R. 68 at 10–11]. A municipality cannot be held vicariously liable for the constitutional violations of their employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). To prevail on a municipal liability claim, Schirmer must prove

> an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Schirmer alleges that the municipal defendants failed to adequately train, hire, and supervise officers. [R. 68 at 10–11].

Schirmer can demonstrate defendants' failure to provide adequate training in one of two ways. First, he can "show a pattern of similar constitutional violations by untrained employees" and the defendants' "continued adherence to that approach" established a "conscious disregard for the consequences of its action." *Shadrick v. Hopkins County, Ky.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (citing *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). Second, he could "establish a single violation of federal rights, accompanied by a showing that [defendants] failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Id.* at 739 (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397,

38

409 (1997)). The first option is not at issue in this case and not supported by the record. Thus, Schirmer must show that the municipal defendants "failed to train their employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick*, 805 F.3d at 738–39. That requires a showing that it is "obvious that the failure to train will lead to certain conduct, *and* [that it is] obvious (*i.e.*, clearly established) that the conduct will violate constitutional rights." *J.H. v. Williamson Cnty., Tennessee*, 951 F.3d 709, 721 (6th Cir. 2020).

"Failure to train is not measured by information retention or whether 'better or more training' would have avoided the incident." *Harris v. City of Saginaw, Michigan*, 62 F.4th 1028, 1038 (6th Cir. 2023). "Failure to train is measured by inquiring if the [municipality] 'completely disregarded' its duty to train" its staff. *Id.* A single staff member's unsatisfactory training cannot fasten liability on the municipality, because the staff member's shortcomings "may have resulted from factors other than a faulty training program." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390–91 (1989). *Monell* liability similarly does not attach simply because the particular municipality does not offer additional training beyond the state's required standards. *Gambrel v. Knox County, Kentucky*, 25 F.4th 391, 411 (6th Cir. 2022) (collecting cases). The question before the Court is thus whether a reasonable juror could find that the municipality "completely failed to provide any type of training" addressing how to address medical situations in the Powell County Detention Center. *Saginaw*, 62 F.4th at 1038.

There is no factual dispute as to whether the individual defendants received training. Kentucky state regulations require jail staff to receive "a minimum of 24 hours annual in-service training." 501 Ky. Admin. Regs. 3:160. Schirmer argues that Nester, Case, and Adams did not meet the required 24 hours of training in the years leading up to Schirmer's incident. [R. 95 at 23]. Schirmer claims that these failures to meet the 24-hour requirement "was a 'moving force'

39

behind the incident and was 'closely related' to the caused injury," adding that "the three jailers with seriously deficient training were the ones who interacted closely with Tyler" and that "their training deficiencies occurred immediately before this incident." *Id.* at 24.

"A *Monell* claim that survives summary judgment is exceedingly rare, and rightly so." *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 542 (6th Cir. 2018). Evidence of individual training shortcomings cannot overcome the high bar needed to establish municipal *Monell* liability. But that is precisely the argument advanced by Schirmer: that more training would have prevented this incident. That is not enough to establish municipal liability on a deliberate indifference claim. *Saginaw*, 62 F.4th at 1038. The municipal defendants did not "completely disregard" its duty to train staff, evidenced by the fact that the individual defendants *received* training. [R. 95 at 24]. Indeed, any deficiencies in training appear to "result[] from factors other than a faulty training program," particularly where one of the named individual defendants received all of his required hourly training. *Id.* The Court will not speculate as to what these other factors could be other than to say that it is clear that the county did not completely abandon its duty to train staff.[7] Schirmer has likewise not shown, or even argued, how the facts of this incident reflect a "recurring situation presenting an obvious potential for a constitutional violation." *Shadrick*, 805 F.3d at 738–39. Schirmer's evidence—that some individuals received less than their state-required training—is simply not sufficient to show the County's failure to train reflects deliberate indifference to the constitutional rights of pretrial detainees at the Powell County Detention Center. *Hanson*, 736 F. App'x at 542–43.

---

[7] Any number of factors could have contributed to this. The Court particularly notes the devastating impact that COVID-19 had on corrections facilities and staff over a period of several years. COVID impacted daily work in correctional settings and strained staffing, training, and institutional programming, and certainly could have contributed to reduced training offerings at Powell County. *See* Novisky, M.A., Tostlebe, J., Pyrooz, D. *et al.*, *The COVID-19 pandemic and operational challenges, impacts, and lessons learned: a multi-methods study of U.S. prison systems*, 11 Health Justice 51 (2023), https://doi.org/10.1186/s40352-023-00253-6.

**C**

The final remaining claim involves Schirmer's count for Fourteenth Amendment medical indifference against Sheriff Rogers. Much of Schirmer's medical indifference claim focused on the actions of the county jail employees generally and on George Nester particularly. In five sentences citing no legal authority, Schirmer contends that Rogers' actions "meet all progs [sic] of the Fourteenth Amendment medical test. He acknowledged a serious medical issue and then did nothing." [R. 82-1 at 25]. Rogers responded in opposition that Schirmer was no longer in the custody of his agency and that Sixth Circuit precedent did not legally require any action on his part after he heard about Schirmer's suspected poisoning. [R. 96 at 17–19] (citing *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017). Notably, there is a genuine factual dispute about whether Rogers offered to help at all. Ashley Schirmer's deposition testimony, Sheriff Rogers told Ashley that "I'm going to go over there now" after allegedly receiving the report from Ashley. [R. 82-16 at 73]. But Rogers, in his own deposition, denied that he would relay any information to the jail. [R. 82-21 at 12–13]. On reply, Schirmer argues it is irrelevant whether Rogers offered to help, citing to the Kentucky statutes describing the power of Kentucky sheriffs. [R. 99 at 14].

Schirmer first cites Ky. Rev. Stat. § 70.060, which reads that

> Any sheriff, deputy sheriff or other like officer may command and take with him the power of the county . . . to aid him in the execution of the duties of his office, and may summon as many persons as he deems necessary to aid him in the performance thereof.

He further cites Ky. Rev. Stat. § 70.130, which reads

> The sheriff shall, by himself or deputy, convey all persons to the penitentiary or juvenile facility condemned to confinement therein, and execute the sentence of the court in other criminal and penal

41

cases. But the court may order the coroner or jailer to act in the place of the sheriff in the discharge of those duties.

Citing no authority, Schirmer argues that the statutes "make it clear that a Sheriff has authority and therefore duty to oversee issues involving prisoners where he is personally aware and has the power to intervene." *Id.* It has been the opinion of the Kentucky Attorney General since 1982 that the jailer and jail staff—not the sheriff—are responsible for taking prisoners to the hospital or to a doctor.[8] OAG 82-403, 1982 Ky. AG LEXIS 237 (Aug. 2, 1982). Although the Sheriff exercises extensive power in the county, the county jailer is a distinct constitutional position, independently elected by voters in the county to exercise the powers of the jailer. Ky. Const. § 99; Ky. Rev. Stat. §§ 71.010–.100, 441.005–.990. Under the definitions of the relevant provision, "jail personnel" do not include the Sheriff or any member of the Sheriff's Department. Ky. Rev. Stat. § 441.005(6). They are entirely separate entities.

Applying this framework, it is clear to the Court that Schirmer has not sufficiently plead that Rogers, as a matter of law, was deliberately indifferent. First and foremost, there is a significant factual dispute as to the entire interaction between Ashley and Rogers. Second, even if Rogers offered to help, Schirmer cites no caselaw—and the Court has found none—suggesting that Rogers could be liable under a medical deliberate indifference theory when his agency no longer had custody over Tyler. Third, despite Schirmer's generous reading of the Kentucky statutes, Kentucky's Constitution and revised statutes hold that Schirmer was in the legal custody, control, and care of the jailer. Accordingly, the Court will deny Schirmer's summary judgment motion as it pertains to Rogers and enter summary judgment in favor of Rogers on this Count, given that even *if* he offered to check in, Kentucky law is clear that he could not be liable under such a theory when his agency had no custody of Tyler at the time.

---

[8] *See also* Ky. Rev. Stat. § 70.130 (Notes of Decisions, 1. Hospital Trips).

## III

The facts of this case are extraordinary. Tyler Schirmer suffered an injury that will impact him for the rest of his life. But he cannot overcome the defense of qualified immunity. For that and for the other reasons articulated in this memorandum opinion, the Court enters summary judgment in favor of the Powell County defendants.

Therefore, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1.  Schirmer's Motion for Partial Summary Judgment **[R. 82]** is **DENIED**.

2.  Defendants' Motion for Summary Judgment **[R. 88]** is **GRANTED**.

3.  Schirmer's Motion to Strike **[R. 83]** and Motion in Limine **[R. 84]** are **DENIED as moot**.

4.  Defendants' Motion in Limine **[R. 90]** and Motion to Exclude **[R. 91]** are **DENIED as moot**.

5.  This action is **DISMISSED** and **STRICKEN** from the Court's active docket.

6.  A Judgment will be entered contemporaneously herewith.

This 31st day of March, 2026.

Gregory F. Van Tatenhove
United States District Judge